## NEW YORK COMMON PLEAS.

HORACE F. CLARK and others agt. GEORGE LAW and others.

Where a court of equity interposes to compel a *trustee* to give up property pur-
chased in *his own name for his own benefit,* which belonged or rightfully be-
longed to the *trust estate,* it does so in aid of and to *protect the right of the
cestuis que trust.*

Where the *cestuis que trust* are not of that class over whom a court of equity
watches with such vigilant guardianship as not to permit them to transfer or dis-
pose of their rights, that they can act for themselves; and where it appears by the
averments in the answer to the complaint that they have acted for themselves and
relinquished their rights and interests in the subject matter of the litigation,
their trustees can have no claim in their behalf.

Where the answer is a full and complete denial of the equity of the bill, an *injunc-
tion* will not be allowed.

*New York Special Term, January,* 1860.
MOTION for a perpetual injunction, &c.

HORACE F. CLARK, *for the motion.*
H. W. ROBINSON, *opposed.*

DALY, F. J.   The use to which the premises were applied,
and the fact that the trustees expended in the course of seven
years one hundred and fifty thousand dollars, to adapt them
to that use, would create a very strong presumption that
the land was obtained by Law for the benefit of, and as part
of, the trust estate; but this presumption is overcome by
what is stated in the answer.

It is averred in the complaint, but only upon information
and belief, that the Panama Railroad Company permitted
the trustees to make use of the land and of the water privi-
leges upon Navy Bay, with the view of inducing them to
run their steamers to that place, and upon the understand-
ing that they would make suitable improvements upon the
land, and would run their steamers there.   This is posi-
tively denied in the answer of the Panama Railroad Com-

pany, who aver, on the contrary, that the negotiation for the purchase of their interest in the land was with Law, in his personal capacity, and that the consideration therefor, was the engagement on the part of Law, that he would aid them with his capital and experience in continuing their work, then in process of erection, and that he would in person visit the road.

It is also positively denied in the answer of Law, that the Panama Railroad Company permitted the trustees to use the land, upon the understanding that they would make suitable improvements and run their steamers to Navy Bay, &c. He also avers positively that neither the trustees nor the United States Mail Steamship Company, nor the Panama Railroad Company, ever claimed or pretended that the trustees ever had any title or claim to the land, and denies that he did as trustee, in violation of his duty, procure to be placed in his own name, any property whatever in which the trustees had either a legal or an equitable title. He avers, on the contrary, that in the month of June, 1851, he was requested by parties interested in the construction of the Panama Railroad Company, to take an interest in the construction of that road, and that, as an inducement thereto, an understanding was had between him and the Panama Railroad Company, that in case he took such an interest, he might select a piece of land at Navy Bay, to be conveyed to him for his own exclusive benefit; that in the month of July following, he invested in the stock and bonds of the company to the amount of $300,000, and selected the land in question. That on the 7th of May, 1852, a resolution was passed that the land so selected be given to him, which, on the 12th of December following, was approved by the executive committee of the company, and the president was authorized to prepare a deed to him; that he did not demand a deed until November, 1859, when a resolution was passed directing the president of the company to execute a deed to him, which was accordingly

executed on the 5th of November, 1859.   There is nothing
in the affidavit of Scott inconsistent with what is here
averred, or which can be regarded as disproving it, and as
respects the right to an injunction, it might be sufficient to
stop here and declare that the equities of the bill are sub-
stantially denied.   But this appears still more conclusively
from subsequent averments in the answer of Law.

Where a court of equity interposes to compel a trustee
to give up property purchased in his own name for his own
benefit, which belonged, or rightfully belongs to the trust
estate, it does so in aid of and to protect the right of the
*cestui que trust.*   (*Campbell* agt. *Walker*, 5 *Ves.*, 679; *Hatch*
agt. *Hatch*, 9 *id.*, 295 ; 1 *Story's Equity Jurisp.*, sec. 321,
323.)   In this case the *cestuis que trust* were the United
States Atlantic Mail Steamship Company, and Albert G.
Sloo.   It is averred in Law's answer that he was the owner
of 7,182 shares of the stock of that company on the 18th
of March, 1854; that on that day he sold the shares to
Marshall O. Roberts, one of his co-trustees, subject to cer-
tain covenants and conditions, and that he resigned and
ceased to be a trustee on the 4th of April following.  Among
the covenants and conditions subject to which the sale to
Roberts was made, was the following : That if Roberts
should well and truly keep all the covenants entered into.
on his part, that " the United States Mail Steamship Com-
pany, and the trustee aforesaid, should have the privilege,
so far as the privilege was vested in Law, of landing and
receiving freight and passengers at and from the wharf,
and of occupying the storehouse upon the premises in ques-
tion, in the manner in which the same were then used by
the steamships run by the trustees, during the residue of
the unexpired term of the mail contract, as the *tenants of
Law*, without the payment of any *other rent* than the keep-
ing of the wharf and storehouse in as good repair as they
were then in, and the payment of all taxes, assessments, or
charges which might be lawfully imposed upon the premises,

and that upon those conditions, he, Law, *let and demised* the premises to them for the said period, and Roberts covenanted to so keep them in repair, to pay all tax-assessments and lawful charges, and at the expiration of the term to *surrender up the premises to Law, his heirs and assigns.* It is then averred that on the 11th of April following, Roberts sold the 7,182 shares of the United States Mail Steamship Company, upon their agreeing to assume and perform in his stead, among others, the covenants and conditions above stated, entered into by him with Law, which sale was consummated and perfected by an unanimous resolution of the board of directors of the United States Mail Steamship Company. It is further averred that Sloo, the remaining *cestui que trust*, on the 18th of July, 1859, by an instrument under his hand and seal, released and discharged Law from all claims or demands against him, *growing out of anything done by him* under the trust, and it is further averred that part of the expenditures of the trustees for improvement was made before Law sold the 7,182 shares to Roberts, and in lieu of rent, and that the remaining part was made under and in conformity with the covenant assumed by the United States Mail Steamship Company in Roberts' place and stead.

From the averment it appears that the *cestuis que trust*, if they ever had any claim to these premises, under the trust, have relinquished it, and have distinctly recognized as against themselves, Law's exclusive ownership and property in the premises. The United States Mail Steamship Company deliberately assumed the relation of Law's tenant, and the performance of a covenant which bound them to surrender up the premises to him at the expiration of the term, which has now expired, and Sloo has released and discharged him from all obligations of any kind under the trust. The *cestuis que trust* were not of that class over whom a court of equity watches with such vigilant guardianship as not to permit them to transfer or dispose of

their right.   They could act for themselves, (*Stuart* agt. *Kissam*, 2 *Barb. S. C.*, 494,) and their acts show very clearly that they, the parties ultimately interested, did not understand that they had any right or claim to these premises, or if they had that they saw fit, for reasons which were satisfactory to them, to relinquish it.

It is averred that the United States Mail Steamship Company knew the facts to be as stated in the answer of Law, and if this were so, it cannot be claimed that they assumed the relation of Law's tenant and the performance of the covenant entered into by Roberts, ignorant of the nature of the rights.   The release of Sloo shows that it was entered into after a suit had been instituted by him against Law in the United States court, and that it was a general release as comprehensive as it could be, discharging Law from all claims or demands of every kind and nature in law or in equity which he (Sloo) had, or ever had by reason of any matter, cause or thing from the beginning of the world to the day of the date of the release, from which averments it appears that both parties, Sloo and the United States Mail Steamship Company, acted understandingly.   If the *cestuis que trust* stand in such a position as this, and were, as I hold they were, competent to place themselves in such a position, (*Brier* agt. *Stokes*, 11 *Ves.*, 319,) I do not see what claim their trustees can have, who are merely the representatives of their rights and interests.

The answer of Law is, in my opinion, a full and complete denial of the equity of the bill, and shows that the injunction asked for should not be granted, and that the temporary injunction should be discharged.   As this conclusion reaches the whole case, it becomes unnecessary to examine or pass upon the numerous other questions discussed upon the argument.